# SUPERIOR COURT OF BALTIMORE CITY.

Filed February 3, 1916.

THOMAS R. BAYLY, JR.,
VS.
HOWARD B. HERRING.

*B. H. Hartogensis* for plaintiff.
*E. J. Ellinger* for defendant.

GORTER, J.—

This suit was brought by Thomas R. Bayly, Jr., against Howard B. Herring on two promissory notes, dated April 6, 1912. One for $500, due on or before March 1, 1912, and the other for $1,500, due on or before September 1, 1912. The notes bore the signature of Herring as maker, and at the time of their delivery were endorsed by R. K. Hartwell Co., by R. K. Hartwell, president. They were drawn to the order of Thomas R. Bayly, Jr.

The circumstances under which the notes sued on were given were these: Some months prior to April 6, 1912, the R. K. Hartwell Company had been incorporated to do the lumber business. The capital stock of the company was $20,000; $10,000 of the stock was issued to Hartwell for the good will of a lumber business which he had been carrying on; $1,000 of stock was issued to him for certain office furniture, some lumber and a small sum of money in bank, between one and two thousand dollars, and $2,000 of stock was to be issued, or was issued, to him for cash, which he agreed with Bayly that he was to put into the business. Three thousand dollars of the stock was to be issued to Bayly, for which he was to pay in cash. Herring was a man without means. He subscribed to none of the stock, but two shares were given to him. The evidence, I think, shows they were all three incorporators and directors of the company. Herring was the salesman, receiving a salary of $30 a week. Hartwell was the president of the company and Bayly was an officer. Bayly

and Herring were young men; Hartwell was the man with experience. After the company had been running for several months, Bayly, who had paid in $2,400 of his $3,000 subscription, became dissatisfied because Hartwell had paid in none of the $2,000 cash subscription to stock. Bayly's dissatisfaction and his demand that Hartwell should pay in the $2,000 cash subscription for stock made Hartwell desirous of getting Bayly out of the company. So arrangements were made whereby Bayly was to sever his connection with the company. These arrangements were consummated on April 6, 1912. Bayly surrendered his certificates of stock, and new certificates for $3,000 were issued on April 6, 1912, in the name of Herring. The notes sued on were drawn up and given to Bayly and the stock certificates issued in the name of Herring were endorsed by him, and were given to Bayly to secure the notes. A number of smaller notes for $50 or $75 each, executed as the notes sued on, payable on the first of the succeeding months, were also given to Bayly. So that he held notes equal to the amount he had paid in on his subscription to stock, about $2,400, and for a portion of his unpaid salary. At the same time, and as part of and as showing the nature of the transaction, the following paper was signed by Hartwell and Bayly and given to Herring:

(We omit the heading.)

"As per agreement between Richard K. Hartwell, Thomas R. Bayly, Jr., and Howard B. Herring, promoters of the R. K. Hartwell Company, Thomas R. Bayly, Jr., hereby transfers three shares of the capital stock of the above-named company standing in his name and purchased by him to Howard B. Herring, under the following conditions: That the R. K. Hartwell Company is to pay the notes issued by Howard B. Herring in favor of Thomas A. Bayly, Jr., in settlement of the stock hereby transferred and in turn to charge said amount of notes to the account of Howard B. Herring, and it is further agreed that in the event of the successful outcome of the aforesaid corporation and the continued valued services of Howard B. Herring, that when the dividends of the company issuing from the aforesaid 30 shares of stock are equal to the face value of said stock, same is to become

the property of Howard B. Herring, and that said stock is to remain in the possession of Thomas R. Bayly, Jr., until the notes issued by Howard B. Herring and endorsed by R. K. Hartwell Company are paid. The above is the correct understanding between the parties aforesaid.

(Signed)

"R. K. HARTWELL,
"THOMAS R. BAYLY, JR."

The company ran along for several months and paid to Bayly a number, if not all, of the small notes, aggregating between $400 and $500, but before paying the two notes sued on in this case, went into bankruptcy. The purport of the transaction was for the company to purchase its own stock and to hold the same with the promise of some time in the future of giving the stock to Herring when the dividends thereon should equal the par value of the stock, provided Herring still remained in the employ of the company. This was a company with its stock issued in the manner above described, its only other resource being a loan of $5,000 with one of the banks based on the credit of Hartwell's father.

In view of the above facts, it is clear that the transaction of April 6, 1912, was really a purchase by the company of its own stock, with an attempt to use Herring and the notes to conceal the real nature of the transaction. The case falls within the rulings of Burke vs. Smith, 111 Md. 624, where it was held, quoting the case of the Mechanics Bank vs. The Maryland Trust Co., 102 Md. 608, that a contract of a company to purchase its own stock "either for the purpose of holding or selling it" or for "cancelling or retiring it," is an illegal transaction. In the case of Burke vs. Smith, the Fitzgerald-Wedge Company gave its note to Burke for his stock in the company. The note was endorsed by Smith and Shriver. Burke sued Smith and Shriver as endorsers on the note. It was held that the contract was against public policy and illegal, and that Smith and Shriver were not liable. In the case at bar Herring is sued as the maker of the note, but the written agreement signed by Hartwell and Bayly states the conditions under which the note was given and by it the company undertakes primarily to pay the notes, and certainly Herring is only second-

arily liable, if liable at all, under the provisions of the agreement. I think the case we are considering is covered by the principles enunciated in the two cases above referred to, and that, by reason of the illegality of the transaction, Herring cannot be held on the notes, even if under the agreement it were contemplated that he should in any event be called upon to pay them.

But, I think, the meaning of the agreement is that Herring was not to be liable at all on any of the notes signed by him and given to Bayly; that the Hartwell Company alone was to be looked to by Bayly for the payment of the notes. By the agreement it is perfectly clear that the company was to pay the notes, because the agreement so says in terms. Now if the company were to be primarily liable and Herring to pay the notes if the company did not, there would have been no occasion to have had Bayly a party to the agreement, as such an arrangement could have been made by the company and Herring without the sanction of Bayly.

Again, it was not in contemplation of the parties that Herring was to own the stock until the company earned dividends on the stock equal to its face value, $3,000, and then only provided he remains in the company's employ. This is the way in which Herring, under the agreement executed by Bayly, is to become the owner of the stock. Certainly to be called upon to pay the notes at their maturity would be a very different thing from paying for the stock with dividends upon the stock; and if this were the stipulation upon the part of the company only and not upon the part of Bayly also, why did Bayly sign the paper? The agreement does not say the stock is sold to Herring and to become his when the notes are paid. It says Bayly transfers the stock standing in his name to Herring "under the following conditions," and then the conditions are enumerated.

If the Court puts itself in the position the parties occupied on April 6, 1912, and construes the agreement from that point of view, there would be little reason to suppose that Herring intended or Bayly expected Herring to get into the position that he, Bayly, was trying to extricate himself from. I think a reasonable construction of the agreement leads to the con-

clusion that Herring was not to be called upon to pay the notes at all, but that he signed the notes at the instance of Hartwell, who was attempting to conceal and avoid the illegality of the transaction.

The Court declares the law that if the Court sitting as the jury find from the evidence that the object, design and effect of the transaction which took place between the plaintiff and defendant and Hartwell on April 6, 1912, as shown by the evidence in the case, was that the Hartwell Company was to purchase its own stock, then such transaction would be illegal and the verdict should be for the defendant.