A. D. LAWRENCE, Jr., and Z. Maurine Lawrence, Husband and Wife, Respondents,

v.

The CAMERON SAVINGS AND LOAN ASSOCIATION, a Corporation, Appellant.

No. 51235.

Supreme Court of Missouri,

Division No. 1.

Nov. 8, 1965.

J. William Blackford, Kansas City, for respondents.

Robert E. Coleberd, Liberty, Frank L. Pulley, Cameron, Hale, Coleberd, Kincaid & Waters, Liberty, of counsel, for appellant.

HOUSER, Commissioner.

■ Action in equity by A. D. Lawrence, Jr. and his wife Maurine against The Cameron Savings & Loan Association and Cecil Benson and his wife Jessie, to impress a trust in favor of plaintiffs on certain real estate conveyed by plaintiffs to the Bensons and compel its reconveyance to plaintiffs; for a decree finding that the association has no interest in the real estate and to declare null and void and cancel all deeds and deeds of trust affecting it; to quiet title in plaintiffs as the true owners and to recover moneys from all defendants. Tried to the court, the issues were found for plaintiffs. Defendants Benson did not appeal. The association did appeal to this court. We have jurisdiction because the title to real estate is involved. Mo.Const. 1945, Art. V, § 3, V.A.M.S.

The Lawrences owned 20 acres of land. Cecil Benson, Lawrence's brother-in-law, is a contractor. The Lawrences and Bensons made an oral agreement that the 20 acres be conveyed to the Bensons; that Cecil Benson would plat and develop the tract as a subdivision to be known as Lawrence Heights, an addition in Clay County; that Benson would handle the business details, secure financing and build houses on the lots, the Lawrences to be paid $500 or $600 each for the lots depending on their size, when houses were built and lots were sold, with nothing due the Lawrences until lots were sold. Unsold lots not built on were to be reconveyed to the Lawrences.

In order to secure a construction loan the Lawrences and the Bensons went to the offices of the association, where they talked to George Johnson, its secretary-treasurer. The details of the agreement between the Lawrences and the Bensons were discussed with him, including the proposal that the subdivision be financed by a construction loan to be made by the association. The arrangements proposed were satisfactory to Johnson, who agreed to them including the price the Lawrences were to receive for the lots. In the course of the conversation Johnson said that the best way to do it was for the Lawrences to deed the property to the Bensons and that the association would make the payments of the sums due the Lawrences, because the association was furnishing the money. Johnson stated and repeated that "if it didn't work" the Lawrences were "to take the land back, that they [the association] didn't want high priced land down there to pay city taxes on." Arrangements were thus made at that meeting with Johnson for the association to advance and lend Benson the money for the purpose of building houses on the Lawrence Heights subdivision, with an understanding on Johnson's part that the Lawrences were to be paid for their lots when a house was built, completed and sold, at the rate of $500 or $600, depending upon the size and location of the lot, and that unsold lots were to be reconveyed to the Lawrences. This was an oral, not a written, agreement. On the same day, May 7, 1954, a warranty deed conveying the 20 acres from the Lawrences

to the Bensons was prepared by Johnson and executed and acknowledged by the Lawrences before Johnson in his capacity as a notary public. Nothing was paid by the Bensons to the Lawrences for executing the warranty deed. The fact that the Lawrences were paid nothing for the land was known to Johnson.

In 1954 and 1955 three duplexes were built on three of the $600 lots. These duplexes were not sold, having been built for investment purposes. The Bensons at first collected the rents, and paid them to the association. Later the association took over the collection of the rents. The Lawrences were never paid for the three lots on which the duplexes were built.

After the land was platted and on May 4, 1956 the Bensons executed a note to the association for $211,925.19 and gave the association a deed of trust on all of the lots in the subdivision as security for the loan. The association, through Johnson, had knowledge that the land was not paid for— that the Bensons had not paid the Lawrences for the land—when the deed of trust was made in its favor.

Over a period of several years several houses, financed by the association and built by Benson, were sold to the public. The association also furnished Benson with money to build roads and a septic tank and disposal unit in the subdivision. When houses were constructed and sold the association would issue its check payable to the Lawrences for the agreed amount due the Lawrences for the lots sold, and would prepare a release on the particular lot for the Lawrences to sign. Association checks were mailed to and received by the Lawrences, who cashed the checks issued by the association after executing the written release to the Bensons of the Lawrences' interest in each of the lots sold.

Eventually Benson quit building houses, and the Bensons defaulted in the payments due the association on their note. Finally the deed of trust was foreclosed, and the as-

sociation bought the property in at the trustee's sale.

At the trial Johnson, then executive vice-president of the association, testified that the litigation prevented the giving of clear title to the lots in question, but that when the lots and duplexes could be sold and clear title given it was his intention to carry out the agreement and pay the Lawrences for the lots "in keeping with and according to his understanding and agreement."

Plaintiff's petition is in two counts.

Count I alleges that on and from May, 1950 plaintiffs were owners of the land; that in 1954 they contracted with Benson for the construction of homes thereon and their sale and that plaintiffs would transfer the land to the Bensons, for which the Bensons were to pay plaintiffs $500 or $600 per lot when each house was sold or completed; that lots not built on were to be returned to plaintiffs; that plaintiffs relied on the statements and representations of the Bensons "and the officers and agents of the company" and reposed special trust and confidence in them and relied upon them for advice; that a fiduciary and trust relationship existed; that houses have been built on all but nine lots described by lot and block number; that plaintiffs have received payment for all of the lots built upon except three lots upon which duplexes were built and two other described lots which have been built upon and transferred to another party unknown to plaintiffs; that the Bensons owe plaintiffs $2,800 for lots sold and built upon or transferred; that building operations have ceased but the Bensons have failed and refused to transfer back the lots not built upon; that plaintiffs have no adequate remedy at law. The prayer of Count I is for judgment for $2,800 due them from the Bensons and for a court order impressing a trust on the land and requiring the Bensons to transfer back to plaintiffs the nine lots not built upon.

Count II incorporates the allegations of Count I and further alleges that the association has been financing construction

loans upon each of the houses built by Benson; that plaintiffs had an understanding and agreement with the association that if the building operations ceased plaintiffs would get their land back on which no houses were constructed; that the association arranged the details of the transfer of the property and assured plaintiffs (1) that they were to receive the $500 or $600 per lot when the houses were completed; (2) that they would get their money first and that plaintiffs' right to reconveyance in event of failure to build houses would not be jeopardized by liens or mortgages held by the association; and (3) that Benson held the property in trust for plaintiffs and that plaintiffs were the true and equitable owners of the land; that the association has received moneys of plaintiffs which should have been paid to them and has refused to pay for the three lots on which duplexes have been built; that the association is collecting the rents on the duplexes but refuses to pay plaintiffs; that two certain lots have been transferred to a realty company and houses are being built upon them; that the money for these lots has been received by the association which fails and refuses to pay the money to plaintiffs; that the association is claiming some interest in the property but has no claim in truth or fact; and that plaintiffs have no adequate remedy at law. Count II concludes with a prayer that the court determine that the association has no interest in the nine lots upon which no houses have been constructed; judicially declare that any legal documents, deeds, deeds of trust, or otherwise, be delivered up and cancelled and declared null and void, and that plaintiffs are the true owners of said land and that the title be quieted in them, and compel the association to pay plaintiffs any moneys of the plaintiff.

The judgment does not dispose of the two counts separately. It finds the issues for plaintiffs generally and adjudges that plaintiffs are the owners of the nine lots upon which no houses have been built, describing them; declares null and void "any legal documents, deeds of trust, or deeds, or other-

wise, held by the defendants on or concerning the aforesaid lots"; quiets title to those lots in plaintiffs; grants judgment against the association for $1,000 for two lots (for which the Lawrences held the association's uncashed check), and grants judgment and a lien for $600 each (total $1,800) on the three lots on which duplexes are built.

The association's first point is that Count I does not state a claim upon which relief can be granted against the association. Plaintiffs concede that Count I, standing alone, is not directed against the association but solely against the defendants Benson, who have not appealed from the judgment. It is clear that Count I, considered by itself, does not state a claim upon which relief can be granted against the association.

The association's second point is that Count II does not state a claim upon which relief can be granted against the association because it does not state any facts showing a violation of any rights of the Lawrences resulting in their damage; that the charge that the association agreed that if operations ceased the Lawrences would get their land back upon which no houses were constructed and would get their money first conflicts with and goes beyond the powers of a savings and loan company as prescribed in Chapter 369, V.A.M.S., regulating these institutions, and that such agreements and assurances are ultra vires and far beyond the statutory authority of the association; that Chapter 369 does not authorize the secretary-treasurer of a savings and loan association to bind the latter by entering into an oral agreement such as is alleged, and that the oral contract is invalid; and because, disregarding the ultra vires allegations of Count II, no facts are left upon which to establish a cause of action against the association.

■ The facts alleged in Count II as supplemented by those stated in incorporated Count I state a cause of action in equity against the association to quiet and determine title, and sufficiently allege a violation by the association of the rights of

plaintiffs and their resultant damages. Under these facts plaintiffs have an equitable right to get back the lots upon which houses were not built, to payment for the lots upon which houses were built, and to payment for the lots upon which duplexes were built not for sale but for investment purposes. The resultant damage is the deprivation of the lots not built upon and the failure to receive the agreed sums for the lots built upon.

■ The defense of ultra vires is in the nature of confession and avoidance, 19 C.J.S. Corporations § 1331 a. It is an affirmative and special defense which must be specially pleaded in order to be available, Von Schleinitz v. North Hotel Co., 323 Mo. 1110, 23 S.W.2d 64, 80; Chouteau v. Missouri-Lincoln Trust Co., 310 Mo. 665, 276 S.W. 49, and cannot be raised by general denial. Fricke v. Belz, 237 Mo.App. 861, 177 S.W.2d 702, 708 [14]. Matters constituting an avoidance or an affirmative defense must be set forth affirmatively in the pleadings in the trial court. Civil Rule 55.10, V.A.M.R. The defense of ultra vires was not raised in the association's answer or other pleading and was not tried by the express or implied consent of the parties under Civil Rule 55.54. The question of the authority of Johnson as an officer of the association to make agreements for and enter into contracts binding upon the association was raised at the trial, but not the question of the power and authority of the association as a savings and loan institution under Chapter 369, V.A.M.S., to enter into the agreement in question. The association did not refer to the defense of ultra vires until it filed its brief on appeal. This is too late.

The association contends, however, that the allegations of the petition disclose on its face that the contract is ultra vires under Chapter 369, V.A.M.S., on the theory that the rule requiring the defense of ultra vires to be pleaded does not apply where the invalidity of the contract sued on appears as a matter of law on the face of the petition.

19 C.J.S. Corporations § 1331 b; Coliseum Athletic Ass'n v. Dillon, 204 Mo.App. 504, 223 S.W. 955.

■ Assuming that the association is subject to the limitations imposed by Chapter 369, and further assuming for the purpose of facilitating the disposition of this appeal that the contract exceeded the powers conferred upon the association by Chapter 369, nevertheless, since the contract was not malum in se and did not violate any express statutory provision, it was not illegal in the sense that an action depending upon the contract cannot be maintained. "The fact that a contract of a building and loan association is ultra vires does not necessarily make it void or relieve the parties of liability thereunder. Although the association has no right to enter into such a contract, it may have capacity to do so, and where the other party has acted in good faith and has fully executed the contract on his part, the association, having received the benefit of such performance, is estopped to set up the defense of ultra vires unless the act is malum in se or is expressly prohibited." 13 Am.Jur.2d Building and Loan Associations § 42, pp. 184, 185, and the following cases there cited: Eastern Bldg. & Loan Ass'n v. Williamson, 189 U.S. 122, 23 S.Ct. 527, 47 L. Ed. 735; In re San Fransico Bay Exposition, D.C.Cal., 50 F.Supp. 344; Kadish v. Garden City Equitable Loan & Bldg. Ass'n, 151 Ill. 531, 38 N.E. 236; Marion Trust Co. v. Crescent Loan & Invest. Co., 27 Ind.App. 451, 61 N.E. 688; Montrose Perpetual Bldg. Ass'n v. Page, 143 Md. 631, 123 A. 68. Here the Lawrences in good faith conveyed their land to the Bensons partly in reliance upon the promises of Johnson, who was acting as an officer of an agent for the association. The Lawrences fully executed the contract on their part. The association received the benefit of their performance. The contract is not malum in se and is not prohibited by any express provision of Chapter 369. The association, having received the benefit of the performance of

the contract, is estopped to avail itself of the defense of ultra vires.

For its third point the association contends that the Lawrences did not make a submissible case against it because of failure to show that Johnson, secretary-treasurer of this association, had authority to enter into a binding agreement on behalf of this association; because Chapter 369 does not provide that construction loans may be governed by oral contracts between a borrower and a savings and loan association, and because the oral agreement between the Lawrences and the Bensons did not apply to the association and was merged in the deed from the former to the latter.

■ The association asserts that there is nothing in Chapter 369 which gives the secretary-treasurer of a savings and loan association the authority to bind the association by entering into an oral agreement such as plaintiffs count upon and that there is nothing in the evidence to show Johnson's authority to thus bind the association. Even if this be accepted, the association is nevertheless bound by the acts and knowledge of its secretary-treasurer under the facts of this case, on the theory of ratification. It is unquestionably true that Johnson knew that the Lawrences had not been paid for their land when he approved the making of a loan to the Lawrences' grantees, the Bensons. Johnson admitted that he was thus informed. With that knowledge Johnson, secretary-treasurer and director of the association, was present at the meeting when the matter was passed upon by the officers of the corporation. Johnson testified that he discussed the loan with the officers at that meeting when, presumably, the loan was approved. While there is no evidence that Johnson discussed the *oral* agreement in question with the officers of the corporation, it is clear that he permitted the loan to be passed upon and approved in the ordinary course of business. In

this situation Johnson's knowledge of the transactions had and agreements reached with the Lawrences and the Bensons, while sitting as a member of the board of directors, is to be imputed to the board of directors. "[T]he existence in the breast of a single director, while sitting in the board, of a matter of knowledge which he ought to communicate, and which he can properly communicate to his codirectors, is knowledge to the corporation as matter of law. 10 Cyc. 1057. And it is also true that the principal is ordinarily chargeable with the knowledge acquired by his agent in executing the agency." Home Building & Loan Ass'n of Joplin v. Barrett, 160 Mo. App. 164, 141 S.W. 723, 728 [4]. With imputed knowledge of the arrangement the board of directors approved the loan and thereby ratified the agreement and understanding reached by Johnson.

The association further contends that Chapter 369 does not authorize a savings and loan association to enter into an oral agreement with a borrower, the effect of which is to reduce the security for a construction loan. This is another facet of the ultra vires argument, against which the association is estopped, as we have decided, supra.

The association counts upon a stipulation during the trial by counsel for the Lawrences that the conversation between Lawrence and Benson "applies only" to the defendant Benson (and therefore inferentially was not applied to the association). It is clear from the record, however, that this stipulation related only to the conversations between Lawrence and Benson prior to the time they went to the office of the association and not to conversations between Lawrence and Benson at the office in the presence of Johnson.

■ On the contention that the agreement was merged in the warranty deed: This action is not based upon the deed but

upon the contract, by the terms of which the execution of the deed was to be only a part execution—a necessary act preliminary to the fulfillment, as one step in the performance, of the entire contract. The deed was collateral to the contract and the contract was not merged in the deed. Tighe v. Locke, Mo.App., 299 S.W. 105, 108 [1].

The association's fourth point is that the judgment entry is null and void. Five reasons are suggested. The first three repeat contentions previously considered and overruled. We need not go over ground already plowed. The last two propose the insufficiency of the evidence to support the judgment entered. For instance, it is contended that the finding that plaintiffs are the owners of the nine lots not built upon is contrary to the evidence that the property was conveyed to the Bensons by a warranty deed vesting in them a fee simple title without exceptions or reservations. Under the facts in evidence, however, the deed conveyed only the bare legal title and the Bensons, and upon foreclosure the association, took the title subject to the equitable right of the grantors to be reinvested with the title upon the contingency agreed upon. Equity will impose a constructive trust in the unsold lots in favor of the original grantors who have been deprived of their property by the acts of the foreclosing mortgagee which, with full knowledge of all of the surrounding facts and circumstances, wrongfully repudiated the arrangement and has sought to retain the property for its own use and benefit. Suhre v. Busch, 343 Mo. 679, 123 S.W.2d 8, 16.

The association claims there is no evidence or basis for that part of the judgment entry declaring null and void the warranty deed from the Lawrences to the Bensons and the deed of trust from the Bensons to the association. While the decree reaches the proper net result (divestment of the title from the association and its reinvestment in the Lawrences) its provisions with respect to the real estate more appropriately should declare that the association holds the bare legal title in trust as constructive trustee for the Lawrences; that the latter are the true equitable and beneficial owners of the lots; that title thereto is forever quieted in the Lawrences, and should order the association to reconvey the title to the Lawrences within a certain time, failing in which the fee simple title to the lots, unencumbered by any deed of trust or lien or claim of the Bensons or of the association, shall be reinvested in the Lawrences by force of the decree. Contrary to the contentions of the association we find evidence to support paragraphs 2 and 3 of the decree granting judgment against the association for $1,000 and $1,800, respectively, with this exception: Paragraph 3 does not name the association as the party against whom the judgment for $1,800 is rendered. This should be corrected on remand.

We therefore affirm the judgment and decree of September 9, 1964 in the following respects: the general finding of the issues for the plaintiffs; the adjudication that plaintiffs are the owners of the nine lots upon which houses have not been built and quieting title thereto forever in plaintiffs and against defendants; the provisions of paragraphs 2 and 3, with the exception noted in the last preceding paragraph, and the assessment of costs. That portion of the judgment and decree which provides "That any legal documents, deeds of trust, or deeds, or otherwise, held by the defendants on or concerning the aforesaid lots are held and declared null and void" is set aside. The cause is remanded with directions to modify and amend the judgment and decree by excising the material above quoted and substituting therefor appropriate provisions consistent with the views expressed in the last preceding paragraph, including the naming of the association as the party against which the $1,800 judgment is rendered. The costs of this appeal are assessed against the appellants because the setting aside of a portion of the judg-

ment and decree and the remand for modification are for technical reasons only and not for reasons related to the merits of the appellant's claims.

WELBORN and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.